Electronically Filed
Intermediate Court of Appeals
CAAP-12-0000506
08-NOV-2013
09:09 AM

NO. CAAP-12-0000506

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

BRADLEY JOHN ARGUE, Plaintiff-Appellee, v.
BONDU KONDEH ARGUE, Defendant-Appellant

APPEAL FROM THE FAMILY COURT OF THE THIRD CIRCUIT
(FC-D NO. 10-1-252K)

MEMORANDUM OPINION
(By: Foley, Presiding J., Leonard and Ginoza, JJ.)

Defendant-Appellant Bondu Kondeh Argue (Bondu) appeals[1] a April 23, 2012 Divorce Decree entered in the Family Court of the Third Circuit[2] (family court), which denied her request for a spousal support award from Plaintiff-Appellee Bradley John Argue (Bradley).

I. BACKGROUND

A. Background of the Parties

On September 20, 1985, Bondu and Bradley were married in Sierra Leone, Africa. Bradley is from Minnesota and went to Sierra Leone to work for the Peace Corps. Bondu was born and

---

[1] Bondu's opening brief fails to comply with Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4). "Generally, failure to comply with HRAP Rule 28(b)(4) is alone sufficient to affirm the trial court's judgment. Nonetheless, this court observes a policy of affording pro se litigants the opportunity to have their cases heard on the merits, where possible." Hawaiian Properties, Ltd. v. Tauala, 125 Hawai'i 176, 181, 254 P.3d 487, 492 (App. 2011) (internal quotation marks, citations, and brackets omitted).

[2] The Honorable Aley K. Auna, Jr. presided.

raised in Sierra Leone and was self-employed from 1986-1988. Bondu had a child by a previous marriage, Kumba "Betty" Argue (Betty), born October 27, 1985, whom Bradley legally adopted. The Argues had three biological children during the marriage. Scott Sahr Argue (Scott) was born on September 5, 1987; John Tamba Argue (John) was born on September 8, 1993; and a minor child (minor child) born August 10, 1995. Betty and Scott are adults and are not financially dependent on their parents. John is an adult who attends Penn State University and lives with Bondu. The minor child also lives with Bondu, who currently has legal and physical custody. Bradley is responsible for John and the minor child's college expenses.

In 1989, the Argues moved from Sierra Leone to Alabama, where Bradley completed his college degree at Auburn University. Bradley financed his education with savings, student loans, and graduate assistant work. Bradley continued to attend school, graduating with a master's degree in December 1991 and a doctoral degree in 1996. Bondu asserts "she was the sole breadwinner, working three jobs to support the family while [Bradley] was going through college for his undergraduate and graduate and PhD in Alabama." In Alabama, Bondu worked in the fast food industry, did babysitting, yard work and house cleaning, and worked as a pond maintenance technician.

While Bradley attended school, the Argues "lived the life of a young financially struggling family trying to make ends meet." In 1998, Bradley found employment on Oʻahu and the Argues relocated. The Argues continued to struggle financially due to Hawaiʻi's higher cost of living. In 2001, Bradley took a new job on Hawaiʻi island with Moana Technologies, LLC and commuted from Oʻahu until 2005, when he moved to Hawaiʻi island permanently. Bondu and the children continued to live on Oʻahu where Bondu engaged casual work as a babysitter, yard worker, and a caretaker for the elderly and sick people.

In August 2006, Bondu moved to Pennsylvania where she worked as a caretaker for Vision Health Care until 2011. She

2

continues to live there with the minor child and John. Bradley visited Bondu and his children 1-2 times a year through 2008.

At the time that the parties' case went to trial, the net marital estate was worth (-)$37,255, of which Bradley assumed (-)$31,717 of the debt and Bondu assumed (-)$5,538. Bondu was 47 years old and Bradley was 53 years old.

In November 2010, Bradley left his position as a research scientist with Moana Technologies, LLC in Kona and entered a three-year employment contract with the National Prawn Company in Saudi Arabia. Over the course of the proceedings, Bradley's reported monthly gross pay increased from $8,000 per month in his October 13, 2010 Income and Expense statement to $8,533 in his May 19, 2011 Income and Expense statement.

Bondu's Income and Expense statement dated June 28, 2011 shows a negative balance of (-)$3,361. She asserts that she currently has no income and finances her living expenses from child support payments and charity from friends. Bradley has paid Bondu $1,590 a month for John's and the minor child's living expenses since January 2010;[3] and two friends, one of whom is a friend of Bradley's and to whom Bondu refers to as a "brother," help her financially. Bondu alleges that Vision Health Care discontinued her employment in January 2011 because her illiteracy precluded her from obtaining a license required of careworkers. Bondu claims she is unemployed and is seeking vocational rehabilitation services from the State of Pennsylvania.

Bondu was first diagnosed with chronic back problems in Hawai'i and has had at least three major incidents where emergency assistance was required to get her out of bed. At the February 24, 2012 hearing, Bondu testified to the family court that her "back gets stuck" and she left her home on a stretcher a "few times." Bradley observed that Bondu "would throw out her back at times," received muscle relaxant medical treatment for

---

[3] On July 5, 2011, the family court ordered Bradley to continue paying $1,590 per month in child support to Bondu for the minor child and John.

that condition, and "at times [her back pain] was a problem [in 'taking care of her activities, the daily living or her work,'] if she had to turn someone over or something." Bondu will not be able to afford medical coverage, which costs on average $400-$500 a month.

B.   Procedural History

On October 12, 2010, Bradley filed a complaint for divorce.[4] On February 3, 2011, Bondu filed her answer. The family court entered a divorce decree on April 23, 2012.

The parties entered a stipulation agreement, filed on February 24, 2012, reserving for trial issues relating to "[a]limony, an Equalization Payment on division and distribution of assets and debts, and Attorney fees . . . ."[5] Also on that day, trial was held to resolve spousal support, equalization payment issues, and other property disputes.[6]  On March 20, 2012, the family court entered its Findings of Fact (FOFs), Conclusions of Law (COLs), and Order (FOF/COL/Order).

The FOF/COL/Order made the following relevant findings:

---

[4]  The parties discussed whether Bradley's employment outside Hawaiʻi in the six months prior to filing for a divorce raises a jurisdictional issues at a September 21, 2011 hearing. His 2010 Hawaiʻi tax return, resolving questions about his domicile, was received into evidence on February 24, 2012.

[5]  Child custody and support issues were resolved in the following ways: (1) Bradley pays for John's college expenses, averaging $1,218 per month; (2) Bondu was awarded legal and physical custody of the minor child, and Bradley was awarded reasonable visitation and travel rights with respect to the minor child; (3) Bradley was made responsible for financing John and the minor child's college education and related expenses.

[6]  The parties' property and debt responsibilities were divided in the following ways: (1) Bradley is responsible for debts in his name and a Discover card debt of $3,693 and an IRS debt of $4,200; (2) Bondu is awarded the 2007 Honda Odyssey and is responsible for debts of approximately $10,000 on that vehicle and all debts in her name; (3) Parties retain personal properties in their possession and bank accounts in their own names; and (4) Bradley retains a $6,000 IRA account.

The parties stipulation agreement reserved equalization payment issues for trial. The family court concluded that Bondu would owe Bradley $13,089.50 "as an equalization payment under Hawaii's Marital Partnership Model absent valid and relevant consideration exist [sic] for equitable deviation." Bradley did not seek an order awarding him an equalization payment.

4

68.  [Bondu] has a back condition that she said started while the partes lived in Alabama.

69.  [Bradley] acknowledged that he knew [Bondu's] back would give her problems when it would fair [sic] up occassionally [sic], and that she had been prescribed muscle relaxants.

70.  Despite her back condition, [Bondu] continued to work as a caretaker on Oahu and in Pennsylvania up until 2011.  [Bondu] claims she was laid off from her last job not because of her back or any medically related issue, but because she was not licensed as a [caretaker].

71.  No evidence was offered concerning what treatment or accommodations, if any, [Bondu] requires for her back condition, nor how it effects her now versus in previous years.

72.  [Bondu] claims to be functionally illiterate with a limited ability to read and write in the English language.

73.  [Bondu] did not speak English when she and [Bradley] first met.

74.  No evidence of what services, if any, that [Bondu] needs to address her illiteracy, or need for education, was submitted.  [Bondu's] current unemployment is unrelated to illiteracy.
    .  .  .  .

80.  [Bradley] took the job in Saudi Arabia to help pay for John's and [the minor child's] college education, and he has stipulated to be solely responsible to financially assist them.  Paragraph 12 of the February 24, 2012 stipulation and order.

81.  [Bondu] claims she is now unemployed and seeking vocational rehabilitation services from the State of Pennsylvania.

82.  [Bondu's] Income and Expense Statement (Exhibit A) shows a negative balance of -$3,361.

83.  When asked how she makes up the deficiency, [Bondu] testified that she has two friends and a brother that help her financially.  However, no debts to such friends or brother are listed in her Asset and Debt Statement.
    .  .  .  .

84.  [Bondu] has less than $4,416 in net debt. Exhibit 12.

85.  [Bradley] has $35,733 in debt he is solely liable for and another $6,443 in joint debt that he has agreed to be responsible for paying.  Exhibit H and the parties' Feb. 24, 2012 stipulation.

86.  In addition, [Bradley] was unable to pay any of his $1,306 monthly estimated self-employment taxes for 2011 because of his attorney's fees and costs, and the $5,000 in fees he was ordered to pay on behalf of [Bondu], for a total

of $15,672 in unpaid taxes.

. . . .

87.    [Bondu] seeks $3,000 a month in alimony from [Bradley].

88.    What specific factors she believes support this alimony claim, or for how long, was not provided by [Bondu].

The family court's COL 5 restates factors that it considers in determining a spousal support award under Hawaii Revised Statutes (HRS) § 580-47(a)(1)-(13) (Supp. 2012).[7] In addition to considering the enumerated HRS § 580-47(a) factors, the family court applied "the 4-part test provided by the <u>Vorfeld</u>

---

[7]    HRS § 580-47(a) states in part:

§ 580-47 Support orders; division of property. (a) . . . .

In addition to any other relevant factors considered, the court, in ordering spousal support and maintenance, shall consider the following factors:

(1)    Financial resources of the parties;

(2)    Ability of the party seeking support and maintenance to meet his or her needs independently;

(3)    Duration of the marriage;

(4)    Standard of living established during the marriage;

(5)    Age of the parties;

(6)    Physical and emotional condition of the parties;

(7)    Usual occupation of the parties during the marriage;

(8)    Vocational skills and employability of the party seeking support and maintenance;

(9)    Needs of the parties;

(10)   Custodial and child support responsibilities;

(11)   Ability of the party from whom support and maintenance is sought to meet his or her own needs while meeting the needs of the party seeking support and maintenance;

(12)   Other factors which measure the financial condition in which the parties will be left as the result of the action under which the determination of maintenance is made; and

(13)   Probable duration of the need of the party seeking support and maintenance.

[v. Vorfeld, 8 Haw. App. 391, 804 P.2d 891 (1991)] case[.]" The family court's COL 6 restates the Vorfeld analysis:

> [T]he relevant circumstances are as follows. The first relevant circumstance is the payee's need. What amount of money does he or she need to maintain the standard of living established during the marriage? The second relevant circumstance is the payee's ability to meet his or her need without spousal support. Taking into account the payee's income, or what it should be, including the net income producing capability of his or her property, what is his or her reasonable ability to meet his or her need without spousal support? The third relevant circumstance is the payor's need. What amount of money does he or she need to maintain the standard of living established during the marriage? The fourth relevant circumstance is the payor's ability to pay spousal support. Taking into account the payor's income, or what it should be, including the income producing capability of his or her property, what is his or her reasonable ability to meet his or her need and to pay spousal support?

Vorfeld, 8 Haw. App. at 402-03, 804 P.2d at 897-98 (citing Cassiday v. Cassiday, 6 Haw. App. 207, 215-16, 716 P.2d 1145, 1151 (1985) aff'd in part, rev'd in part, 68 Haw. 383, 716 P.2d 1133 (1986)).

In regard to Bondu's request for spousal support, the family court concluded:

> 7. Applying the foregoing findings of fact to the factors outlined by HRS § 580-47(a) and the 4-part test provided by the *Vorfeld* case, [Bondu] has failed to demonstrate the [sic] an award of alimony to her is necessary for her to maintain a standard of living established during the marriage, or that [Bradley] has the ability to pay spousal support.

The family court denied Bondu's spousal support claim. Bondu submitted a Motion for Reconsideration, which the family court denied on April 23, 2012 and issued the Divorce Decree. Bondu filed her Notice of Appeal on May 22, 2012, raising the divorce decree's denial of "[a]limony and other relief" as the subject of the appeal.

## II.  STANDARD OF REVIEW

### Family Court Decisions

> Generally, the family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion. Thus, [an appellate court] will not disturb the family court's decisions on appeal unless the family court disregarded

7

> rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

Fisher v. Fisher, 111 Hawai'i 41, 46, 137 P.3d 355, 360 (2006) (quoting In re Doe, 95 Hawai'i 183, 189-90, 20 P.3d 616, 622-23 (2001)).

"A court abuses its discretion whenever it exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party." Barbee v. Queen's Med. Ctr., 119 Hawai'i 136, 152, 194 P.3d 1098, 1114 (App. 2008) (Internal quotation marks and ellipses omitted). "Furthermore, the burden of establishing abuse of discretion is on appellant, and a strong showing is required to establish it." Ek v. Boggs, 102 Hawai'i 289, 294-95, 75 P.3d 1180, 1185-86 (2003) (internal quotation marks, citation, and brackets omitted).

> In cases of conflicting evidence, the credibility of the witnesses and the weight to be given their testimony are within the province of the trial court and, generally, will not be disturbed on appeal. It is not the function of appellate courts to second-guess the trier of fact where there is substantial evidence in the record to support its conclusion.

Barbee, 119 Hawai'i at 152, 194 P.3d at 1114 (citation omitted).

### FOFs - Family Court

> The family court's FOFs are reviewed on appeal under the "clearly erroneous" standard. A FOF is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. "Substantial evidence" is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

Fisher, 111 Hawai'i at 46, 137 P.3d at 360.

### COLs - Family Court

> A COL is not binding upon an appellate court and is freely reviewable for its correctness. [An appellate] court ordinarily reviews COLs under the right/wrong standard. Thus, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned. However, a COL that presents mixed questions of fact and law is reviewed under the clearly

erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case.

Schiller v. Schiller, 120 Hawai'i 283, 288, 205 P.3d 548, 553 (App. 2009) (quoting Chun v. Bd. of Trs. of Employees' Ret. Sys. of the State of Hawai i, 106 Hawai'i 416, 430, 106 P.3d 339, 353 (2005)).

## III. DISCUSSION

We review the family court's COLs under a right/wrong standard. Schiller, 120 Hawai'i at 288, 205 P.3d at 553. The family court's COL 6 applied the Vorfeld four-factor "alimony analysis" along with HRS § 580-47(a) factors to Bondu's request for spousal support. We note Vorfeld concerned appellate review of an order modifying spousal support, as opposed to initial spousal support under review here.

The factors underlying an initial alimony determination differ from the standard for a modification where a court must assess whether a "material change in circumstances" has occurred since the divorce. Vorfeld, 8 Haw. App. at 402, 804 P.2d at 897. This contextual difference does not render the family court's application of the enumerated four circumstances in Vorfeld erroneous, however, because the "relevant circumstances" considered in determining initial spousal support apply to the question of modification.[8] Id. at 402-03, 804 P.2d at 897-98.

---

[8] Vorfeld added a fourth relevant circumstance to the three-part Cassiday analysis: "[w]hat amount of money does [the payor] need to maintain the standard of living established during the marriage?" Vorfeld, 8 Haw. App. at 403, 804 P.2d at 897. Under Cassiday,

the most relevant factual questions are sequentially as follows:

1. Taking into account the property awarded in the divorce case to the party seeking spousal support, what amount, if any, does he or she need to maintain the standard of living established during the marriage?

2. Taking into account the income of the party seeking spousal support, or what it should be, and the income producing capability of the property awarded to him or her in the divorce action, what is his or her ability to meet his

(continued...)

9

Applying HRS § 580-47(a) factors and the Vorfeld/ Cassiday alimony analysis, the family court concluded in COL 7, that Bondu "failed to demonstrate the [sic] an award of alimony to her is necessary for her to maintain a standard of living established during the marriage, or that [Bradley] has the ability to pay spousal support." The family court's FOFs and COLs disregarded testimony from the parties and were clearly erroneous. The family court essentially concluded that the amount Bondu needed to maintain the standard of living established during the marriage was (-)$3,361 per month.

The family court made the following FOFs concerning Bondu's capacity to meet her needs independently:

> 70. Despite her back condition, [Bondu] continued to work as a caretaker on Oahu and in Pennsylvania up until 2011. [Bondu] claims she was laid off from her last job not because of her back or any medically related issue, but because she was not licensed as a [caretaker].

> 71. No evidence was offered concerning what treatment or accommodations, if any, [Bondu] requires for her back condition, nor how it effects her now versus in previous years.
> . . . .

> 74. No evidence of what services, if any, that [Bondu] needs to address her illiteracy, or need for education, was submitted. [Bondu's] current unemployment is unrelated to illiteracy.
> . . . .

> 88. What specific factors she believes support this alimony claim, or for how long, was not provided by [Bondu].

These FOFs are clearly erroneous because substantial evidence does not support them. In fact, the evidence presented

---

[8](...continued)
or her need independently? . . . .

> 3. Taking into account the income of the party from whom spousal support is sought, or what it should be, and the income producing capability of the property awarded to him or her in the divorce action, what is his or her ability to meet his or her needs while meeting the need for spousal support of the party seeking spousal support?

Cassiday, 6 Haw. App. at 215, 716 P.2d at 1151.

is contrary to these findings. FOFs 71 and 74 found Bondu failed to produce evidence that links her back condition and illiteracy to her current unemployment. Letters and testimony from Bondu's doctors identified her back condition and treatments without albeit opining how they impacted her employment prospects. Bondu, however, testified that she cannot take jobs as a nanny or cleaning houses because "it's gotten to a point, my back. I live on ibuprofen, and my doctor know that, and muscle relaxer. Sometime I can't sit too long. My back gets stuck." Bradley also acknowledged Bondu "would throw out her back at times," received muscle relaxant medical treatment for that condition, and "at times it [her back pain] was a problem [in 'taking care of her activities, the daily living or her work,'] if she had to turn someone over or something." FOFs 71 and 74 erroneously disregard Bondu and Bradley's testimony and exhibits linking Bondu's back pains to her ability to work.

FOFs 70 and 74 found Bondu was terminated from Vision Care employment because she lacked a caretaker license and that Bondu's current unemployment is not related to her illiteracy. These findings disregard evidence that linked Bondu's inability to obtain a caretaker license to her lack of English language skills. Bondu testified at trial that she was not able to get the caretaker license "[b]ecause I can't read." Bondu's English language teacher also testified that Bondu cannot read and comprehend written documents.

The family court's FOFs 70, 71, and 74 found that Bondu's current unemployment was unrelated to either her back condition or literacy levels. The record lacks substantial evidence to support these FOFs and rather indicates Bondu's unemployment is related to her health and illiteracy. Although "the credibility of the witnesses and the weight to be given their testimony are within the province of the trial court," this court is not prohibited from challenging the trier of fact where there is no substantial evidence in the record to support the fact-finder's conclusion. Compare Barbee, 119 Hawai'i at 152,

11

194 P.3d at 1114 ("appellate courts [do not] second-guess the trier of fact where there <u>is</u> substantial evidence in the record to support its conclusion.") (Emphasis added.)

Additionally, the family court's FOF 88 is not supported by facts and filings in the record. FOF 88 states "[w]hat specific factors she believes support this alimony claim, or for how long, was not provided by [Bondu]." On March 12, 2012, prior to the family court's FOF/COL/Order, Bondu filed her "Reply to [Bradley's] Proposed Findings of Fact and Conclusions of Law," which claimed spousal support "for the rest of [Bondu]'s life" and cited to facts supporting the application of specific factors to Bondu's spousal support claim:

> [Bradley] earns $102,396 a year and Defendant '0'. [Bradley] has a job pursuant to a three year contract, holds a doctorate degree, and has been able to have gainful employment throughout his adult life. He was supported by [Bondu], who has raised his children and continues to be the matriarch of her family serving as the base for the children to visit and call home.
>     . . . .
>
> [Bradley] makes $8,533 a month and providing [Bondu] $3,500 a month ($1,590 child support and as child support is reduced spousal support would increase) would leave [Bradley] $5,000 a month. [Bradley] would be able to deduct the spousal support obligation which effectively reduces his obligation and [Bondu] would have to pay taxes which effectively reduces the amount she actually will need to live upon.

Facts concerning the parties' income and employment potential are "financial resources[;]" and Bradley's ability to pay and "needs" are relevant factors under HRS § 580-47(a). HRS § 580-47(a)(1), (9), and (11). Bondu specified facts and factors supporting her spousal support claim.

The family court may properly consider the amount Bradley needs to maintain the standard of living established while he was married and his ability to pay spousal support, "[t]aking into account the payor's income, or what it should be, including the income producing capability of his or her property[.]" <u>Vorfeld</u>, 8 Haw. App. at 03, 804 P.2d at 897-98. The family court did not list Bradley's income amongst its "Facts Re Financial Condition of the Parties." Bradley's income has

12

increased and his gross annual income at the time of trial was $102,396 per year, while Bondu's was zero.

Finally, the family court erred by concluding that Bondu had not shown that Bradley has the ability to pay spousal support. Bradley admitted that he "could" pay for alimony, adding "I [Bradley] would have to pay down less of a debt, basically, if I was paying alimony." In response to an inquiry into his desire to pay alimony, Bradley said, "[b]asically, you know, to me, my first priority right now is the children's education. And then also I have to pay down the debt, because retirement will be coming eventually."

## IV. CONCLUSION

We vacate the Circuit Court of the Third Circuit's Divorce Decree filed on April 23, 2012 and remand this case for further proceedings consistent with this opinion.

DATED: Honolulu, Hawai'i, November 8, 2013.

On the briefs:

Bondu Kondeh Argue
Defendant-Appellant pro se.

Daniel S. Peters
for Plaintiff-Appellee.

Presiding Judge

Associate Judge

Associate Judge

13